Filed 6/11/13  P. v. Garcia CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EDWIN OMAR GARCIA,<br><br>        Defendant and Appellant. | B237195<br><br>(Los Angeles County<br>Super. Ct. No. VA120179)<br><br>ORDER TO MODIFY OPINION,<br>REHEARING DENIED<br><br>[NO CHANGE IN JUDGMENT] |

COURT:

        It is ordered that the opinion filed herein on May 21, 2013, be modified by adding the following.


        1.        After the first full paragraph on page 17, add a new paragraph at line 17 as follows:

        **The trial court did not abuse its discretion.  The declaration of defense counsel in support of the *Pitchess* motion only refers to Office Bojorquez making false statements—not to Sergeant Maretti.  At no time before or during the hearing did defense counsel specify why the motion should be granted as to Sergeant Maretti.[5]  Officer Bojorquez drafted the police report.**

2.     Move the footnote 5 mark from page 17, line 18, after **Maretti,** and place it after **Maretti** on the fifth line of the added new paragraph on page 17.

3.     On page 17, line 17, delete **Assuming, without deciding, that** and add, **Even if**.

4.     Add the following to page 18, line 2, after the close of the citation:

**Whether an error is prejudicial because a defendant made a showing of good cause in support of his *Pitchess* request under *Warrick, supra,* 35 Cal.4th 1011, is determined under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*People v. Samuels* (2005) 36 Cal.4th 96, 110.)  Defendant has not shown the prosecutor failed to disclose exculpatory evidence known to it in violation of *Brady v. Maryland* (1963) 373 U.S. 83 and that there is a reasonable probability of a different result if the government's suppression of evidence "'undermines confidence in the outcome of the trial.'"  (*Kyles v. Whitley* (1995) 514 U.S. 419, 434; *In re Williams* (1994) 7 Cal.4th 572, 611.)  It should be noted that the *Pitchess* procedure "is the only avenue by which citizen complaints may be discovered."  (*People v. Gutierrez, supra,* 112 Cal.App.4th at p. 1475.)  Because under *Alford v. Superior Court* (2003) 29 Cal.4th 1033, the prosecutor does not generally have the right to possess and does not have access to confidential peace officer files, the prosecutor has no duty to review the files of all police officer witnesses for purposes of *Brady*.  (See *Gutierrez, supra,* 112 Cal.App.4th at p. 1475.)**

5.     On page 33, lines 6-7, delete *People v. Watson* (**1956**) **46 Cal.2d 818, 836** and add *People v. Watson, supra,* **46 Cal.2d at p. 836.**

Petition for Rehearing is denied.  There is no change in judgment.

_____

MOSK, J.                                                    TURNER, P. J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>EDWIN OMAR GARCIA,<br><br>     Defendant and Appellant. | B237195<br><br>(Los Angeles County<br>Super. Ct. No. VA120179) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Roger Ito and Lori Ann Fournier, Judges.  Affirmed as modified and remanded.

Tamara Zivot, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Marc A. Kohm and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant Edwin Omar Garcia (defendant) was convicted of carrying a concealed dirk or dagger. (Pen. Code, former § 12020, subd. (a)(4)[1]). On appeal, defendant contends that the trial court erred by denying his motion to suppress evidence, failing to instruct the jury on intent to conceal, ordering that he be restrained during trial, imposing a prior prison term enhancement pursuant to section 667.5, subdivision (b), failing to instruct the jury about lawful, transitory or momentary possession of the dirk or dagger, admitting into evidence defendant's three prior convictions for impeachment purposes, and instructing the jury under CALCRIM 226, as modified. Defendant also contends that there is insufficient evidence to support the jury's finding that the knife recovered on his person was a dirk or dagger, the prosecutor engaged in prejudicial misconduct by presenting false and misleading information and argument, and he is entitled to additional days of custody credit. In addition, defendant contends that the trial court erred in denying his *Pitchess* motion as to one law enforcement officer, and requests that we conduct an independent review of the in camera hearing regarding a second law enforcement officer to determine whether it discloses error by the trial court.

We order that defendant's abstract of judgment be corrected to provide that he is entitled to additional custody credits. We otherwise affirm the judgment.

---

[1] All statutory citations are to the Penal Code unless otherwise noted. Effective in 2012, section 12020, subdivision (a)(4) was renumbered with no substantive change and is now section 21310. (Stats. 2010, ch. 711, § 6; *People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1369, fn. 1.) For convenience, we eliminate the term "former" in text when referring to this statute.

## BACKGROUND

### A.  Factual Background

#### 1.  *Prosecution Evidence*

Huntington Park Police Department Officer Mario Bojorquez testified that on June 9, 2011, he responded to a 911 call concerning a domestic dispute at a residence in Huntington Park.  Officer Bojorquez was the first officer to arrive at the scene.  Huntington Park Police Department Sergeant Richard Maretti testified that he also responded to the 911 call, and arrived at the scene after Officer Bojorquez arrived there.

Officer Bojorquez testified that he saw defendant, who fit the description of a man described in the 911 call, outside the door of the apartment, talking to a woman—later determined to be defendant's ex-girlfriend—on the other side of the apartment door.

Officer Bojorquez testified that he asked defendant whether he had any weapons or anything illegal in his possession.  Officer Bojorquez asked defendant permission to search him.  Sergeant Maretti testified that upon his arrival at the scene he heard Officer Bojorquez ask defendant if defendant had any weapons on his person and ask for permission to search him.  Neither officer drew his weapon.  Sergeant Maretti saw Officer Bojorquez search defendant.

Officer Bojorquez and Sergeant Maretti testified that Officer Bojorquez found a fixed-blade knife on defendant's person and handed it to Sergeant Maretti.  Officer Bojorquez testified that he located the knife in the left front pocket of defendant's pants.  Before Officer Bojorquez searched defendant and found the knife in defendant's pocket, he could not see any part of the knife sticking out of defendant's pocket, and he could not otherwise see that defendant had a knife in his pocket.

Sergeant Maretti testified that the total length of the knife found on defendant's person was about five inches long, and Officer Bojorquez testified that it was about five and one half inches long.  Officer Bojorquez and Sergeant Maretti testified that the knife had a two and one-half inch fixed blade and was capable of being used as a stabbing

3

weapon. Sergeant Maretti testified that the knife had a pointed tip, a hand guard, and was sharp enough to penetrate flesh. Two photographs of the knife in question were introduced into evidence, and one of the pictures included the knife next to a ruler.

### 2. *Defendant's Evidence*

Defendant admitted that in 2007 and 2008 he was convicted of three felony convictions for crimes of moral turpitude. On June 9, 2011, defendant went to the apartment of Ayissa Navarro, his then girlfriend, in Huntington Park. When he went inside the apartment, she started screaming at him, stating "Get the fuck out," and "I hate you. I don't want to be with you no more." Navarro pushed defendant out of the apartment and they continued to argue. Navarro said to defendant that she knows he had been cheating on her and that the relationship was over, and she went back inside the apartment. Defendant told her he would not leave until they spoke. When defendant tried to go inside the apartment, Navarro came back outside with a knife in her hand. When asked to describe the knife, defendant testified, "it was a dirk and dagger." Navarro jabbed the knife toward defendant, and told defendant, "Get the fuck out of here."

Defendant was worried at first, but then became "pissed off." He testified that, "I grabbed her hand and end up snatching the knife away from her." Defendant used his right hand to reach for the knife and put the knife in his pocket. He did not throw it on the ground because Navarro could have picked it up and used it against him. Defendant told Navarro, "we need to talk," and began to follow Navarro back into the apartment in an effort to talk with her.

At that time, Officer Bojorquez "grabs" defendant by the arm and tells him, "Come over here . . . and put your hands behind your head." Officer Bojorquez searched defendant. Officer Bojorquez did not ask defendant if he had anything on his person, and did not ask for permission to search him. Officer Bojorquez searched defendant and found the knife. As Officer Bojorquez found the knife, defendant repeatedly said, "I just took it away from my crazy-ass girlfriend." Officer Bojorquez said, "Be quiet, dude."

4

Defendant sat down and noticed that he was bleeding from a small cut on his hand, and said to Officer Bojorquez, "Look, I can prove to you I just took the knife away from my girlfriend," but Officer Bojorquez was on his walkie-talkie and "pretty much" ignored defendant. Defendant was placed in a patrol car, asked Officer Bojorquez why he was being arrested, and told the officer to look at his hand. Defendant introduced into evidence a photograph taken about one week after the June 9, 2011, incident depicted a cut on defendant's hand.

On cross-examination, defendant said the knife had been measured improperly, and that the photograph of the knife next to a ruler had been forged—"[t]hey added an extra inch." Defendant acknowledged, however, that the knife could be used as a stabbing weapon, stating, "It almost was on me."

### 3. Prosecution Rebuttal Evidence

During rebuttal, the prosecution called one witness—Officer Bojorquez. Officer Bojorquez testified that after defendant denied having any weapons or anything illegal, Officer Bojorquez asked defendant, "Is it okay for me to search you?," and defendant said, "Yes." When Sergeant Maretti asked defendant if the knife they found on him was his, defendant said that it was. Defendant told the officers, "I thought it was legal. It's under 4 inches." Sergeant Maretti told defendant that it was illegal to carry a fixed blade, and when Sergeant Maretti asked defendant why he had the knife in his possession, defendant responded, "Because I do." Defendant did not say anything to the officers about Navarro having the knife, or attempting to stab him with the knife. Defendant was not bleeding when he was taken into custody, and Officer Bojorquez saw defendant's hands but did not see any cuts on them.

### B. Procedural Background

The District Attorney of Los Angeles County filed an information charging defendant with carrying a concssealed dirk or dagger in violation of section 12020, subdivision (a)(4). The District Attorney alleged that defendant had one prior "strike"

5

conviction within the meaning of sections 1170.12, subdivisions (a) through (d), and 667, subdivisions (b) through (i), and had served four prior prison terms within the meaning of section 667.5, subdivision (b).

The trial court denied defendant's motion pursuant to section 1538.5 to suppress evidence. The trial court partially granted defendant's motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), and after conducting an in camera hearing, found that there were no records to disclose. Following a trial, the jury found defendant guilty of carrying a concealed dirk or dagger in violation of section 12020, subdivision (a)(4). The trial court found true the prior conviction allegation, and that defendant had served two, not four, prior prison terms.

The trial court sentenced defendant to state prison for a term of six years, consisting of a middle term of two years—doubled for the prior strike conviction—plus two years for the prior prison terms. The trial court awarded defendant 182 days of custody credit consisting of 122 days of actual custody credit and 60 days of conduct credit.

**DISCUSSION**

### A.    Motion to Suppress

Defendant contends that the trial court violated his rights under the Fourth Amendment against unreasonable searches and seizures by denying his motion to suppress evidence because there was not substantial evidence that he consented to the search. We disagree.

### 1.    Standard of Review

"'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our

6

independent judgment. [Citations.]' (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729]; see *People v. Jenkins* (2000) 22 Cal.4th 900, 969 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) In determining whether substantial evidence supports the trial court's findings, '[i]f there is conflicting testimony, we must accept . . . the version of events most favorable to the People, to the extent the record supports them.' (*People v. Zamudio* [(2008)] 43 Cal.4th [327,] 342.)" (*People v. Boulter* (2011) 199 Cal.App.4th 761, 767.)

### 2. Applicable Law

"The Fourth Amendment to the United States Constitution guarantees freedom from unreasonable search and seizure. (U.S. Const., 4th Amend.; U.S. Const., 14th Amend.; *People v. Rogers* (2009) 46 Cal.4th 1136, 1156 [95 Cal.Rptr.3d 652, 209 P.3d 977]; see Cal. Const., art. I, § 13.) A warrantless search and seizure is presumptively unreasonable under the Fourth Amendment. (*People v. Rogers*, *supra*, 46 Cal.4th at p. 1156.) An 'established exception to the warrant requirement is when consent is given by one authorized to give it. [Citations.] By consenting to a warrantless search, one waives the right protected by the Fourth Amendment. [Citations.] [¶] . . . [¶] . . . [C]onsent to enter and search may be express or implied . . . . [Citations.]' (*People v. Superior Court* (*Chapman*) (2012) 204 Cal.App.4th 1004, 1011-1012 [139 Cal.Rptr.3d 298].)" (*People v. Hawkins* (2012) 211 Cal.App.4th 194, 199.) A defendant may file a motion under section 1538.5 to suppress evidence obtained as a result of a warrantless and unreasonable search or seizure. (*People v. Brooks* (1980) 26 Cal.3d 471, 476.)

### 3. Background and Procedural Facts

On September 30, 2011, the trial court considered defendant's motion to suppress evidence filed under section 1538.5 seeking to suppress as evidence the knife Officer Bojorquez recovered from defendant. Defendant contended that Officer Bojorquez's search of his person was illegal.

### a. Prosecution Evidence

At the hearing on defendant's motion to suppress, Officer Bojorquez testified that on June 9, 2011, he responded to a dispatch call about a man arguing with his girlfriend at an apartment complex in Huntington Park. Officer Bojorquez was the first officer to arrive at the scene, and upon his arrival he saw defendant, who fit the description provided to Officer Bojorquez by the dispatch operator, near a closed apartment door and talking to a woman on the other side of the door. No officers had arrived at the scene before Officer Bojorquez contacted defendant. Officer Bojorquez "asked [defendant] if he had any weapons on him or anything illegal on his possession. [Defendant] said, No. [Officer Bojorquez] asked [defendant] if [Officer Bojorquez] could search [defendant]. [Defendant] said, Yes." That conversation between took about two seconds.

Officer Bojorquez testified that Sergeant Maretti arrived at the scene and was present when defendant gave his consent to search. Defendant was not handcuffed or in the patrol car when he gave Officer Bojorquez permission to search him, and Officer Bojorquez did not touch defendant before beginning the search. Officer Bojorquez then "conducted a search [of defendant's person], [and] located a fixed blade in [defendant's] front left pants pocket."

### b. Defendant's Evidence

At the hearing on defendant's motion to suppress, defendant testified that while he was talking to his girlfriend, Officer Bojorquez "grabbed me by the arm, told me: Come over here; told me put my hands behind my head, and started searching me." Officer Bojorquez never asked defendant for permission to search him, and defendant never gave consent to Officer Bojorquez to be searched.

### c. Trial Court's Ruling

The trial court denied defendant's motion to suppress, stating, "Based on the testimony I heard, the 1538.5 motion is denied. I find there was a consensual encounter in that the officer had consent to search [defendant]."

8

## 4. Analysis

Officer Bojorquez testified that defendant denied that he "had any weapons on him or anything illegal on his possession." Officer Bojorquez also testified that he then asked defendant if Officer Bojorquez could search him, and defendant replied "Yes."

Defendant contends that Officer Bojorquez's testimony that defendant consented to the search was not credible because defendant, knowing that he had a knife in his pocket, would not have consented to a search of his person. Although it may have been unwise for defendant to consent to the search, it does not follow that Officer Bojorquez's testimony that defendant had done so was not credible and should be disregarded.

Citing *People v. Dickerson* (1969) 273 Cal.App.2d 645 (*Dickerson*), defendant contends that the trial court erred in adopting Officer Bojorquez's version of the events over that of defendant's version because his version was "equally credible" to Officer Bojorquez's version. In that case, the trial court, confronted with two conflicting versions of whether the defendant gave the law enforcement officers consent to search, stated that it "'must believe one or the other.'" (*Id.* at pp. 650-651.) The court rejected the trial court's assertion that in the face of conflicting testimony, it had to believe one or the other, stating, "The court's statement that it 'must believe one or the other' simply is not correct. If the court found itself unable to determine whether Officer Helvin or Miss Jones were speaking the truth, it was perfectly free to draw the legal consequence from its inability, that is to say, to hold that the prosecution had not carried its burden of proof. Since the court's finding was made pursuant to a nonexisting compulsion, it must be deemed erroneous." (*Id.* at p. 651.) *Dickerson* does preclude a trial court, as occurred here, from relying on an officer's testimony that a suspect consented to a search because it conflicts with defendant's testimony. *Dickerson* is inapposite because the trial court here did not state that it must believe Officer Bojorquez or defendant. Here the trial court did not suggest that it was unable to determine who was speaking the truth.

Defendant contends that Officer Bojorquez's testimony that defendant consented to the search should be rejected because Officer Bojorquez's testimony that during his two-second conversation with defendant Sergeant Maretti arrived at the scene and was

9

present when defendant gave his consent to search, was not credible. Notwithstanding defendant's contention to the contrary, it is reasonable to conclude that Sergeant Maretti arrived at the scene during the two-second conversation between Officer Bojorquez and defendant.

Defendant contends that assuming defendant consented to the search based on the testimony of Officer Bojorquez, Officer Bojorquez exceeded the scope of that search because Officer Bojorquez testified that defendant gave consent to a search only after denying that he had "any weapons." Defendant argues therefore that his consent to a search was necessarily limited to a patdown search pursuant to *Terry v. Ohio* (1968) 392 U.S. 1.[2] According to defendant, "When the officer reached into [defendant's] pocket for the knife, he strayed well outside the scope of [defendant's] alleged consent," and there was no testimony that Officer Bojorquez felt something in defendant's pocket or otherwise justified the officer's search of defendant's pocket. We disagree.

Under *Terry v. Ohio*, *supra*, 392 U.S. 1, when an officer detains a suspect, the officer may pat down the suspect's outer clothing if the officer has a reason to believe the suspect may be armed. (*Id*. at p. 30; see *People v. Lopez* (2004) 119 Cal.App.4th 132, 135-136.) Unless as a result of the patdown search the officer detects that a suspect's pocket contains an object of "incriminating character" that is "immediately apparent," an officer may not search the suspect's pocket to retrieve the object. (*Minn. v. Dickerson* (1993) 508 U.S. 366, 375; *People v. Collins* (1970) 1 Cal.3d 658, 662; *People v. Dickey* (1994) 21 Cal.App.4th 952, 957.) "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect? [Citations.]" (*Florida v. Jimeno* (1991) 500 U.S. 248, 251.)

As noted above, a limited patdown search of a suspect's clothing under *Terry v. Ohio*, *supra*, 392 U.S. 1 occurs when the officer has reason to believe the suspect may be armed. (*Id*. at p. 30.) Officer Bojorquez testified that defendant gave consent to a search

---

[2]     This argument was raised for the first time in the defendant's Reply Brief. We could therefore have disregarded it.

after he denied having "any weapons on him" or anything illegal on his possession. Defendant's consent to the search was not expressly limited to a "patdown" search. He consented to being searched, and that consent does not reasonably imply that it was limited to a patdown search pursuant to *Terry v. Ohio, supra,* 392 U.S. 1. It was reasonable for the trial court to conclude that defendant's consent was consistent with the search undertaken by Officer Bojorquez—reaching into defendant's pocket and retrieving the knife.

### B. Sufficiency of Evidence in Support of True Finding That the Knife Was a Dirk or Dagger

Defendant contends that there is insufficient evidence to support the jury's finding that the knife recovered on his person was a dirk or dagger. We disagree.

#### 1. *Standard of Review*

"'In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."' ([*People v.*] *Rowland* [(1992)] 4 Cal.4th [238,] 269 . . . .) We apply an identical standard under the California Constitution. (*Ibid*.) 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].)" (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) In reviewing the sufficiency of the evidence, "a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*Id*. at p. 1181.) We will reverse for insufficient evidence only if "'"'upon no hypothesis whatever is there

sufficient substantial evidence to support [the conviction].'"'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 577.)

> ## 2. *Analysis*

There is sufficient evidence to support the finding that the knife recovered on defendant's person was a dirk or dagger. Section 12020 stated: "(a) Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison: [¶] . . . [¶] (4) Carries concealed upon his or her person any dirk or dagger." The statute defined a dirk or dagger as "a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. A nonlocking folding knife, a folding knife that is not prohibited by Section 653k [(i.e., a switchblade)], or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position." (§ 12020, subd. (c)(24)[3].) The trial court instructed the jury with CALCRIM No. 2501, which provides in part that, "*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

Sergeant Maretti testified that the total length of the knife was about five inches long. Officer Bojorquez testified that it was about five and one half inches long. Officer Bojorquez and Sergeant Maretti testified that the knife was capable of being used as a stabbing weapon, and had a two and one-half inch fixed blade. Sergeant Maretti testified that the knife had a pointed tip and was sharp enough to penetrate flesh. Two photographs of the knife were introduced into evidence. Defendant described the knife as "a dirk and dagger," and he testified that the knife could be used as a stabbing weapon, stating, "It almost was on me." Defendant also testified that he did not throw the knife on the ground because Navarro could have picked it up and used it against him.

_____

[3]     Section 12020, subdivision (a)(24), effective at the time defendant was arrested, was renumbered without substantive changes and is now section 16470, effective January 1, 2012. (Stats. 2010, ch. 711, § 6.)

### C.    Failure to Instruct Jury Regarding Intent to Conceal

Defendant contends that his right to a jury trial and due process of law under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were violated by the trial court in failing to instruct the jury on intent to conceal in connection with his conviction for carrying a concealed dirk or dagger in violation of section 12020, subdivision (a)(4).  We disagree.

#### 1.    *Standard of Review*

We review claims of instructional error de novo.  (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707; *People v. Burch* (2007) 148 Cal.App.4th 862, 870.)

#### 2.    *Analysis*

As noted above, section 12020 stated:  "(a) Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison:  [¶] . . . [¶]  (4) Carries concealed upon his or her person any dirk or dagger."  The trial court instructed the jury with CALCRIM No. 2501, stating, inter alia, "The defendant is charged with unlawfully carrying a concealed dirk or dagger, in violation of Penal Code section 12020(a).  [¶]  To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant carried on his person a dirk or dagger; [¶]  2.  The defendant knew that he was carrying it; [¶]  3.  It was substantially concealed on the defendant's person; [¶]  AND [¶]  4.  The defendant knew that it could readily be used as a stabbing weapon.  [¶]  The People do not have to prove that the defendant used or intended to use the alleged dirk or dagger as a weapon."

Defendant contends that intent to conceal the dirk or dagger is an element of a violation of section 12020, subdivision (a)(4), and the trial court erred in failing to instruct the jury on intent to conceal the instrument.  Defendant, however, does not cite to any authority to support his contention, and acknowledges that the Supreme Court in *People v. Rubalcava* (2000) 23 Cal.4th 322 "left open the question of whether carrying a

13

concealed dirk or dagger requires that the defendant intend to conceal the instrument."
(*Id*. at p. 338, fn. 1 (conc. opn. of Werdegar, J.).)

Defendant quotes Justice Werdegar's concurring opinion that, "Imposing an intent-to-conceal requirement would . . . be an effective way of narrowing the statute's overbroad scope; the carpenter who puts an awl in his pocket, or the parent carrying a kitchen knife to the PTA potluck, would probably not be found to have intentionally concealed the instrument." (*People v. Rubalcava*, *supra*, 23 Cal.4th at p. 338, fn. 1 (conc. opn. of Werdegar, J.).) Justice Werdegar acknowledged that "Neither the statutory language nor the legislative history is explicit on this point. Reading an intent-to-conceal element into the statute may not be consistent with its overall purposes, as carrying a concealed dagger is dangerous to public safety whether or not the bearer purposely concealed the weapon." (*Ibid*.) Because the offense does not include a requirement that defendant intend to conceal the instrument from other persons, the trial court had no duty to instruct on this element. (*Id*. at pp. 333-334.)

Even if the trial court erred by not giving the instruction, the error was harmless. "[A]n erroneous instruction that omits an element of an offense is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. [Citations.] In general, the *Chapman* test probes 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citations.]' [Citation.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663.)

Defendant testified that immediately before Office Bojorquez arrived at the scene, defendant put the knife in his pocket. Officer Bojorquez testified that defendant denied having any weapons. The knife was concealed in defendant's pocket—Officer Bojorquez could not see any part of the knife sticking out of defendant's pocket, and he could not otherwise see that defendant had a knife in his pocket. Defendant told the officers that the knife belonged to him. Any error by the trial court in failing to instruct the jury on intent to conceal the dirk or dagger was harmless beyond a reasonable doubt.

14

Because we conclude that the trial court did not err in not instructing the jury on intent to conceal, and even if it did err it was harmless error, we do not reach the Attorney General's contention that defendant forfeited his contention.

**D.      *Pitchess* Motion**

Defendant contends that the trial court erred in denying his *Pitchess* motion as to Sergeant Maretti, and requests that we conduct an independent review of the in camera hearing regarding the review of Officer Bojorquez's personnel records to determine whether it discloses error by the trial court.  The Attorney General contends that the trial court did not err in denying defendant's *Pitchess* motion as to Sergeant Maretti, and agrees with defendant that we should review the in camera proceedings to determine whether the trial court erred.

*1.      Denial of the Pitchess Motion as to Sergeant Maretti*

a.      Standard of Review

We review the trial court's ruling on the *Pitchess* motion for abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1286; see also *People v. Hughes* (2002) 27 Cal.4th 287, 330 ["A trial court's ruling on a motion for access to law enforcement personnel records is subject to review for abuse of discretion"].)  "[T]rial courts have broad discretion in ruling on motions to discover police personnel records . . . ."  (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1043; *People v. Samayoa* (1997) 15 Cal.4th 795, 827.)

b.      Background Facts

On August 11, 2011, defendant filed a pretrial discovery motion pursuant to *Pitchess, supra,* 11 Cal.3d 531 (*Pitchess* motion) seeking the discovery of confidential

personnel records for Sergeant Maretti and Officer Bojorquez.[4]  Defendant sought discovery of, inter alia, complaints relating to "fabrication of reasonable suspicion and/or probable cause, illegal search/seizure, . . . writing of false police reports, . . . and any other evidence of misconduct amounting to moral turpitude . . . ."  As to Sergeant Maretti, defendant's counsel declared in support of the *Pitchess* Motion that defendant denies giving consent to any peace officer to search his person, and "Sgt. Maretti searched the defendant after making contact with him without any reasonable suspicion or probable cause to do so."  The trial court denied the *Pitchess* motion with regard to Sergeant Maretti and, as discussed below, granted it with regard to Officer Bojorquez.

c.       Discussion

"Evidence Code sections 1043 through 1045 codify *Pitchess*[, *supra,*] 11 Cal.3d 531 . . . .  'The statutory scheme carefully balances two directly conflicting interests: the peace officer's just claim to confidentiality, and the criminal defendant's equally compelling interest in all information pertinent to the defense.'  (*City of San Jose v. Superior Court* (1993) 5 Cal.4th 47, 53 [19 Cal.Rptr.2d 73, 850 P.2d 621].)  The legislation achieves this balance primarily through a procedure of in camera review, set forth in section 1045, subdivision (b), whereby the trial court can determine whether a police officer's personnel files contain any material relevant to the defense, with only a minimal breach in the confidentiality of that file."  (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220.)

"To initiate discovery, the defendant must file a motion supported by affidavits showing 'good cause for the discovery,' first by demonstrating the materiality of the information to the pending litigation, and second by 'stating upon reasonable belief' that the police agency has the records or information at issue.  ([Evid. Code,] § 1043, subd. (b)(3).)  This two-part showing of good cause is a 'relatively low threshold for discovery.'  [Citation.]"  (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019

---

[4]       The record did not include the *Pitchess* motion.  We obtained a copy of the *Pitchess* motion from the trial court, and order the record augmented to include it.

(*Warrick*); *People v. Gaines* (2009) 46 Cal.4th 172, 179 ["A showing of good cause is measured by 'relatively relaxed standards' that serve to 'insure the production' for trial court review of 'all potentially relevant documents.' [Citation.]"].)

"To show good cause as required by section 1043, defense counsel's declaration in support of a *Pitchess* motion must propose a defense or defenses to the pending charges. . . . [¶] Counsel's affidavit must also describe a factual scenario supporting the claimed officer misconduct. That factual scenario, depending on the circumstances of the case, may consist of a denial of the facts asserted in the police report. [¶] . . . [¶] [A] plausible scenario of officer misconduct is one that might or could have occurred. Such a scenario is plausible because it presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges. A defendant must also show how the information sought could lead to or be evidence potentially admissible at trial. Such a showing 'put[s] the court on notice' that the specified officer misconduct 'will likely be an issue at trial.' [Citation.] Once that burden is met, the defendant has shown materiality under section 1043." (*Warrick*, *supra*, 35 Cal.4th at pp. 1024-1026.)

Assuming, without deciding, that the trial court erred in not granting defendant's *Pitchess* motion as to as to Sergeant Maretti,[5] defendant was not prejudiced. "Finding the trial court erred in failing to provide an in camera review does not end the analysis; appellant must also demonstrate he was prejudiced from the denial of discovery. [Citation omitted.]" (*People v. Hustead* (1999) 74 Cal.App.4th 410, 418.) The standard of prejudice is whether "there is a reasonable probability that the discovery sought . . .

---

[5]    We note that both defendant and the Attorney General refer to trial testimony to support their respective positions as to whether the trial court erred in denying defendant's *Pitchess* motion as to Sergeant Maretti. However, that trial testimony occurred after the trial court ruled on defendant's *Pitchess* motion, and it is irrelevant to our required analysis. The trial court rules on a defendant's *Pitchess* motion based upon defense counsel's declaration in support of it. (*Warrick*, *supra*, 35 Cal.4th at pp. 1019, 1024-1026; *People v. Gaines*, *supra*, 46 Cal.4th at p. 179; Evid. Code, § 1043.)

would have led to admissible evidence helpful to appellant in his defense." (*Ibid.*, citing *People v. Gill* (1997) 60 Cal.App.4th 743, 750-751.)

Officer Bojorquez's testimony was largely duplicative of Sergeant Maretti's testimony. Officer Bojorquez testified that he asked defendant whether he had any weapons or anything illegal in his possession, and asked defendant for permission to search him. Sergeant Maretti testified that he heard Officer Bojorquez ask this of defendant. Both Officer Bojorquez and Sergeant Maretti testified that Officer Bojorquez found a fixed-blade knife on defendant's person and handed it to Sergeant Maretti. Both Officer Bojorquez and Sergeant Maretti testified that the total length of the knife was approximately five inches. And both Officer Bojorquez and Sergeant Maretti testified that the knife had a two and one-half inch fixed blade and was capable of being used as a stabbing weapon. It, therefore, is not reasonably probable that the discovery sought from Sergeant Maretti's personnel file would have led to admissible evidence helpful to defendant in his defense. (*People v. Hustead*, *supra*, 74 Cal.App.4th at p. 418.)

### 2. In Camera Hearing

"When a trial court concludes a defendant's *Pitchess* motion shows good cause for discovery of relevant evidence contained in a law enforcement officer's personnel files, the custodian of the records is obligated to bring to the trial court all 'potentially relevant' documents to permit the trial court to examine them for itself. ([*City of*] *Santa Cruz* [*v. Mun. Court* (1989)] 49 Cal.3d [74,] 84.) A law enforcement officer's personnel record will commonly contain many documents that would, in the normal case, be irrelevant to a *Pitchess* motion, including those describing marital status and identifying family members, employment applications, letters of recommendation, promotion records, and health records. (See Pen. Code, § 832.8.) Documents clearly irrelevant to a defendant's *Pitchess* request need not be presented to the trial court for in camera review. But if the custodian has any doubt whether a particular document is relevant, he or she should present it to the trial court. Such practice is consistent with the premise of Evidence Code sections 1043 and 1045 that the locus of decisionmaking is to be the trial court, not

18

the prosecution or the custodian of records. The custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion. A court reporter should be present to document the custodian's statements, as well as any questions the trial court may wish to ask the custodian regarding the completeness of the record. (See *People v. Jackson, supra,* 13 Cal.4th at p. 1221, fn. 10 [explaining that this court 'reviewed the sealed record of the in camera proceeding'].)" (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1229.)

"The trial court should then make a record of what documents it examined before ruling on the *Pitchess* motion. Such a record will permit future appellate review. If the documents produced by the custodian are not voluminous, the court can photocopy them and place them in a confidential file. Alternatively, the court can prepare a list of the documents it considered, or simply state for the record what documents it examined. Without some record of the documents examined by the trial court, a party's ability to obtain appellate review of the trial court's decision, whether to disclose or not to disclose, would be nonexistent. Of course, to protect the officer's privacy, the examination of documents and questioning of the custodian should be done in camera in accordance with the requirements of Evidence Code section 915, and the transcript of the in camera hearing and all copies of the documents should be sealed. (Fn. omitted.) (See *People v. Samayoa*[, *supra*,] 15 Cal.4th [at p.] 825 [] [after ruling on the *Pitchess* motion, '[t]he magistrate ordered that all remaining materials be copied and sealed'].)" (*People v. Mooc, supra*, 26 Cal.4th at pp. 1229-1230.)

The trial court granted defendant's *Pitchess* motion with regard to Officer Bojorquez "for claims of false police reports, fabrication of probable cause, [and] false claims of consent to search," and held an in camera hearing to review his personnel file. After conducting the in camera hearing, the trial court stated on the record that, "There are no records of the nature sought to be disclosed . . . ."

19

The sealed court reporter's transcript of the trial court's in camera review was included in the record on appeal. However, copies of the documents reviewed by the trial court, but not disclosed to defendant, were not included. After reviewing that transcript, we requested that the record be augmented to include copies of the materials reviewed by the trial court that were not disclosed to defendant. We appointed the trial court to act as referee to conduct record correction proceedings.

Pursuant to our appointment of the trial court to act as referee, the trial court conducted a further in camera proceeding. The sealed reporter's transcript of that proceeding was lodged with this court, along with copies of the documents reviewed by the trial court at the record correction proceeding and the trial court's minute order of the proceedings.

We have reviewed the transcript of the record correction proceeding and all the documents filed under seal with this court that were reviewed by the trial court at the record correction proceeding. Based on that review, as well as our prior review of the original in camera proceeding, we conclude that the trial court did not abuse its discretion by withholding any personnel records that it reviewed.

### E.  Hidden Belt Restraint and Other Security Measures

Defendant contends that the trial court erred by requiring that he be restrained during trial, and ordering additional security measures, in violation of his rights of a fair trial and due process under the Fifth and Fourteenth Amendments to the United States Constitution. We disagree.

#### 1.  Applicable Law

"'[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' [Citation.]" (*People v. Mar* (2002) 28 Cal.4th 1201, 1216; see *People v. Virgil* (2011) 51 Cal.4th 1210, 1270.) "Similarly, the federal 'Constitution forbids the use of visible shackles . . . unless that use is "justified by an essential state interest"—

20

such as the interest in courtroom security—specific to the defendant on trial.' [Citation.] . . . [¶] 'In deciding whether restraints are justified, the trial court may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.' [Citation.] Although the court need not hold a formal hearing before imposing restraints, 'the record must show the court based its determination on facts, not rumor and innuendo.' [Citation.]" (*People v. Lomax* (2010) 49 Cal.4th 530, 559.)

"[E]ven when special court security measures are warranted, a court should impose the least restrictive measure that will satisfy the court's legitimate security concerns." (*People v. Mar*, *supra*, 28 Cal.4th at p. 1206.) "[I]n any case where physical restraints are used those restraints should be as unobtrusive as possible, although as effective as necessary under the circumstances." (*People v. Duran* (1976) 16 Cal.3d 282, 291, fn. omitted.) The Supreme Court has "consistently held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense." (*People v. Anderson* (2001) 25 Cal.4th 543, 596; see *People v. Combs* (2004) 34 Cal.4th 821, 838-839.)

### 2.    *Background Facts*

At the commencement of the trial, outside the presence of the jury, the trial court stated that defendant "was escorted out into the courtroom wearing civilian clothing. He has been restrained in, they call, a stealth belt, a device which is unseen to the public; however, it is an item that is underneath his suit coat, which basically locks him into the defendant's chair. [¶] The court had took this extraordinary measure—I should say, once again, this is unseen to the public. The court took this extraordinary measure asking the bailiffs to put him in a stealth belt because he has a pretty extensive history of violence and unruly and disruptive behavior on prior occasions that the defendant has been in

21

custody. [¶] The court estimates that this is the least-restrictive alternative to having the defendant properly restrained and to maintain courtroom security. The court has had numerous reports that on prior custody situations the defendant on those occasions—in one such occasion, March of '07—apparently slipped his chain, his chain security—he slipped his T.S.T. chain and used it as a weapon against one of the fellow inmates causing a laceration to the inmate's forehead. That was in March of '07. [¶] On also in March of '07 the defendant allegedly—or, I should say, the defendant was reported to have, I think the term was, gassed a deputy by using some item from outside of the cell toilet and throwing it on one of the sheriff's deputies that was providing security at that location. [¶] On a prior—the location in '05 the defendant had been challenging the various sheriff's deputies to fight and had an open matter, apparently been exposing himself and masturbating. [¶] On another occasion in '05 the defendant apparently drew down his pants and exposed his penis and told the detective or the deputy that he was going to sodomize him. [¶] And in another occasion in October of '05, the defendant's cell was searched, and it was a loose razor that was recovered. [¶] And on another such occasion in that same remand period in '05 the defendant had a shank recovered from his person, that being a stabbing instrument that was crudely fashioned out of some eating utensils and so forth. [¶] So based on this long history of assaultive, violent conduct and unruly conduct, the court finds a manifest need to have him placed in the stealth belt. I want to say, for the record, this is an item that is unseen to the jury. This court's going to take this measure. [¶] I should say also, there is a deputy who is seated in the regular location that the deputy's always seated and one additional deputy that's seated in the area about 10 to 12 feet away from the defendant, is not in immediate contact with the defendant, and is in between the defendant and the bench, once again, in this court's estimation, not providing an extraordinary display of any kind of extraordinary restraints. [¶] The court has also directed that [defendant] not be provided with any writing utensils and instruments. If he wants to confer with counsel during the course of the proceedings, he's invited to let [his counsel] know, who can then let us know about what any issues are

22

so [defendant] has a chance to confer with [his counsel–the trial court is] not preventing that activity."

Defendant's counsel objected to the trial court's ruling on the grounds that it was not based on defendant's current custody behavior, and requested that the trial court consider allowing defendant to have some sort of writing instrument, including a dull pencil or a felt-tip pen, during the trial. The trial court responded that the incidents referred to "may have been a few years past [but they occurred] while [defendant] was in the custody situation. [¶] This court is finding that [it] is not appropriate to provide [defendant] with any instruments that could be used as a stabbing instrument whatsoever, which includes a pencil. [¶] I want to say, [defendant's counsel], I will be happy to accommodate if [defendant] has any issues or comments, he wants to confer with you, he may absolutely do so. We'll stop the proceedings . . . at an appropriate time . . . so [defendant] can confer with [defendant's counsel], and I don't want to interfere with [the] attorney-client relationship."

Before defendant testified, the trial court stated outside the presence of the jury, without objection, that when defendant has completed his testimony, "I'll have [the jury] step outside into the jury room and take [defendant] down. I don't want them to see [defendant] restrained, Okay." Defendant's counsel requested that the court instruct the jury that it is the policy of the trial court that a deputy be seated 15 feet from where a defendant is seated in the witness stand, and in front of the jury, whenever any defendant testifies. Defendant's counsel agreed with the trial court response that, "I can say as a matter of court policy a deputy is situated about 15 feet away where the defendant is sitting in the witness stand, they're not to take anything of this one way or another, and that this is simply court policy at this juncture."

The trial court instructed the jury, "Before we get started, ladies and gentlemen, by way of clarification, [defendant] is obviously in the witness stand. There is a sheriff about 15 to 20 feet away from him. I don't want you to take any reference to that at all. That is a court policy in this case. I don't want you to be overly concerned that you

23

should be—it should affect your decision in any way. [¶] Everybody okay with that? Everyone's head's nodding in the affirmative."

At the conclusion of defendant's testimony, the trial court instructed the jury that "I'd like you to step into the jury room real quick." Outside the presence of the jury, the trial court said, "Okay. You want to have [defendant] step back to his seat."

### 3. Analysis

Defendant contends that the trial court erred by requiring that he be restrained during trial, and ordering additional security measures, because the trial court did not do so based on a manifest need. The trial court, however, based the imposition of the security measures on substantial evidence of such a need. As the trial court described it, reciting from "numerous reports" that during prior custody situations, defendant had a "long history of assaultive, violent conduct and unruly conduct," and expressly found "a manifest need to have [defendant] placed in the stealth belt."

Defendant contends that the trial court also erred because the measures chosen were not the least obtrusive that would still be effective. The trial court, however, found that the "stealth belt" and the other security measures were the least obtrusive that would still be effective, stating, "The court estimates that [the "stealth belt"] is the least-restrictive alternative to having the defendant properly restrained and to maintain courtroom security. [¶] . . . . [¶] This court is finding that this [it] is not appropriate to provide [defendant] with any instruments that could be used as a stabbing instrument whatsoever, which includes a pencil." The trial court did not abuse its discretion in finding that the security measures imposed were the least obtrusive that would still be effective because the record relied upon by the trial court provided that on one occasion while in custody defendant slipped his security chain and used it as weapon, and on another occasion defendant fashioned a stabbing instrument out of eating utensils.

As noted above, "courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense." (*People v. Anderson*, *supra*, 25

24

Cal.4th at p. 596; see *People v. Combs*, *supra*, 34 Cal.4th at pp. 838-839.) Defendant does not argue that the "stealth belt" or any of the other security measures impaired or prejudiced his right to testify or participate in his defense. And defendant admits, "[i]t is not clear from the record whether or not the jury was aware of this restraint [i.e., the "stealth belt"]."

Defendant contends that because he did not have any writing utensils, there was an additional sheriff posted next to him in the courtroom, and he did not walk to and from the witness stand in the presence of the jury like the other witnesses, it is reasonable to conclude that the jury believed that he had been placed in a physical restraint during the trial. There is no evidence that the jury noticed these circumstances, but even if the jury did notice them, it is not reasonable to conclude that therefore the jury believed that defendant had been placed in a physical restraint. In addition, the trial court specifically instructed the jury not to form any conclusions based on the fact that defendant was already on the stand and there was a sheriff located about 15 to 20 feet away from him. We presume the jury followed the trial court's instructions. (*People v. Avila* (2009) 46 Cal.4th 680, 719; *People v. Bennett* (2009) 45 Cal.4th 577, 596; *People v. Johnson* (2009), *supra*, 180 Cal.App.4th at p. 710.)

Defendant contends that the trial court erred because it may not simply rely upon "the judgment of law enforcement or court security officers or the unsubstantiated comments of others." The trial court relied upon what it described as "numerous reports on prior custody situations." Defendant has not shown the source of these reports, including whether they were comprised of the judgments of law enforcement or court security officers, or unsubstantiated comments of others.

### F. Prosecutorial Misconduct

Defendant contends that the prosecutor engaged in prejudicial misconduct by presenting false and misleading information and argument in violation of his right to due process and a fair trial. Defendant forfeited this contention.

25

"To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.)

Although defense counsel objected at trial to only one portion of the prosecutor's argument to the jury that he now contends constitutes prosecutorial misconduct, he did not object to most of the alleged instances of prosecutorial misconduct, nor did he ask for the trial court to admonish the jury to disregard the purported impropriety as to any of the alleged misconduct. Defendant asserts that objections would have been futile, the misconduct was egregious, and that we should reach the issue notwithstanding the lack of an objection or request for an admonishment to the jury. Defendant argues that the prosecutor elicited inconsistent testimony at the preliminary hearing or testimony that contradicted the police reports. But if there were inconsistencies, the prosecutor could have determined that this was a matter of credibility. As to prosecutor's closing argument, the defendant's failure to object properly forfeits any issue of improper arguments. In any event, the prosecutor merely argued, in effect, that the jury should believe the officers' testimony, and the prosecutor referred to inferences from their testimony. Defendant's arguments concerning prosecutorial misconduct fail.

### G.     Prior Prison Term Enhancement

Defendant contends that the trial court erred by imposing a prior prison term enhancement pursuant to section 667.5, subdivision (b) for his conviction in case number VA082225 because there is no evidence he served that prior prison term. We disagree.

#### 1.     Background Facts

The information alleged that defendant had served four prior prison terms within the meaning of section 667.5, subdivision (b)[6]—case number BA329227, convicted on

---

[6]     The version of section 667.5, subdivision (b) that was operative at the time defendant committed the crime of carrying a concealed dirk or dagger provided, "Except where subdivision (a) applies, where the new offense is any felony for which a prison

26

February 8, 2008, for violation of section 245, subdivision (c); case number BA320740, convicted on February 8, 2008, for violation of section 243.9; case number VA092681, convicted on June 27, 2007, for violation of section 69; and case number VA082225, convicted on August 23, 2005, for violation of section 261.5, subdivision (c).

On October 6, 2011, defendant waived a jury trial on the issue of his prior convictions, and after the jury found defendant guilty of carrying a concealed dirk or dagger in violation of section 12020, subdivision (a)(4). The trial court stated to defendant, "It is . . . alleged under Penal Code section 667.5 subdivision (b) that you suffered the following convictions, that is for a Penal Code section 245, subdivision (c) from February of 2008 under case number BA329227; case number BA320740 for a violation of Penal Code section 243.9, same date of conviction, 2/8/08; a conviction for Penal Code section 69 under case number VA092681, that taking place on June 27th, '07; and finally a violation of Penal Code section 261.5, subdivision (c), in case number VA082225, that conviction date being 8/23/05. The trial court asked defendant, "Do you waive and give up each of these rights, [and] admit [that] those . . . prior convictions [that defendant allegedly suffered under section 667.5 subdivision (b)] . . . in fact . . . are true?" Defendant responded, "Yes," and defense counsel and prosecutor joined. The trial court found that they were true, and then expressed concern whether the four section 667.5 subdivision (b) convictions were "all separate one-year priors." Defendant's counsel stated, "There are four different commitments," and the trial court responded, "It looks like there's only three commitments, as far as I'm concerned." The matter was "put over" for November 8, 2011.

The matter was revisited on November 8, 2011; the trial court proceeded to conduct a trial on the prior prison term and conviction issues. Prior conviction and prison

sentence is imposed, in addition and consecutive to any other prison terms therefor, the court shall impose a one-year term for each prior separate prison term served for any felony; provided that no additional term shall be imposed under this subdivision for any prison term served prior to a period of five years in which the defendant remained free of both prison custody and the commission of an offense which results in a felony conviction."

27

term documents—certified copies of prison records that included the abstract of judgments for the prior convictions—were received into evidence as exhibit number 1. The trial court stated, "So as far as I can see here, it looks like it's . . . two 667.5(b)s." Defendant's counsel stated, "We are willing to admit to two 667.5(b)s. We believe there's been two separate commitments." The trial court stated, "That's two separate 667.5(b) priors," and defense counsel responded, "Yes, sir."

The trial court stated, based on its review of exhibit number one, that, "I'm going to find those allegations to be true. [¶] So that is two 667.5(b), commonly referred to as one year priors . . . ." The following exchange occurred: [Defendant's counsel:] For the record, the defendant was prepared to admit those today in court before having the process of the court trial. [¶] [Trial court:] Fair enough. [¶] Since I am actually making a factual determination, [defendant's counsel], out of abundance of caution, do you want to be heard, or do you want present evidence, or any witnesses with regards to the [certified records]? [¶] [Defendant's counsel:] No, Your Honor." Defense counsel and the prosecution submitted the matter.

The trial court stated, "The court does, in fact, find beyond a reasonable doubt the truth of the . . . prior 667.5(b) convictions for the one year priors. [¶] The convictions I find to be true are for the commitment 243.9(a) case number BA 320740. That is that progeny is considered one prior 667.5 to be the prior. The second separate term of commitment for the penal section 261 in case VA 082225. Likewise, find that to be true under 667.5(b)."

### 2. *Analysis*

"Imposition of a sentence enhancement under Penal Code section 667.5 requires proof that the defendant: (1) was previously convicted of a felony; (2) was imprisoned as a result of that conviction; (3) completed that term of imprisonment; and (4) did not remain free for five years of both prison custody and the commission of a new offense resulting in a felony conviction. [Citation.]" (*People v. Tenner* (1993) 6 Cal.4th 559, 563; *In re Preston* (2009) 176 Cal.App.4th 1109, 1115.)

28

The trial court enhanced defendant's sentence under section 667.5, subdivision (b), based upon defendant's conviction in case numbers BA 320740 and VA082225. Defendant challenges the sufficiency of the evidence to support a finding of a prior prison term enhancement pursuant to section 667.5, subdivision (b) for his conviction in case number VA082225 because there is no evidence he served that prior prison term. Defendant notes that the abstract of judgment for case number VA082225 provides that defendant was sentenced on June 27, 2007, to state prison for a term of two years and, "The court orders the defendant released on this matter only. Defendant is given total credit for two years in custody."

Because, however, when defendant was sentenced in case number VA082225, he had already served two years in custody, defendant was statutorily deemed to have served a separate prison term under section 667.5. (§ 1170, subd. (a)(3); *People v. Childress* (1987) 189 Cal.App.3d 1220, 1222-1223.) The trial court therefore did not err by imposing a prior prison term enhancement for defendant's conviction in case number VA082225.

Defendant contends that he "received ineffective assistance of counsel when his trial attorney advised him to admit [the] prison priors . . . when, in fact, he had never served a prison term on VA082225." We disagree.

"'To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."'" (*People v. Kipp* (1998) 18 Cal.4th 349, 366 [75 Cal.Rptr.2d 716, 956 P.2d 1169], quoting *Strickland v. Washington* [(1984)] 466 U.S. [668,] 686.) Preliminarily, we note that rarely will an appellate record establish ineffective assistance of counsel. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267-268 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)" (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) "We have repeatedly stressed 'that "[if] the record on appeal sheds no light on why

counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' (*People v. Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212] quoting *People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)  A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.  (*People v. Wilson*, *supra*, at p. 936; *People v. Pope*, *supra*, at p. 426.)" (*People v. Mendoza Tello*, *supra*, 15 Cal.4th at pp. 266-267.)

Here, the record does not reflect whether defendant's counsel "advised [defendant] to admit [the] prison priors."  Even if defendant's counsel had, it is not below the standard of care for counsel to do so because, as noted above, the prior prison term enhancement for defendant's conviction in case number VA082225 was proper. Defendant's counsel is not required to advance meritless arguments.  (*People v. Williams* (1995) 33 Cal.App.4th 467, 481; see *People v. Thompson*, *supra*, 49 Cal.4th at p. 122 [counsel "is not ineffective for failing to make frivolous or futile motions"];  *People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1409 ["trial counsel is not required to make frivolous or futile motions, or indulge in idle acts"].)

In addition, the two one-year section 667.5, subdivision (b) enhancements were based on separate, independent finding of facts by the trial court, not on defendant's admission.  The record sheds no further light on the issue of why defendant's counsel advised defendant to admit the prison priors.

### H.    Jury Instruction Regarding Momentary Possession of Knife

Defendant contends that the trial court erred by failing to instruct the jury about lawful, transitory or momentary possession of the dirk or dagger.  We disagree.

#### 1.    *Background Facts*

The trial court denied the request of defendant's counsel to instruct the jury that momentary possession of a dirk or dagger is not unlawful.  Defendant argued that the trial

court should instruct the jury with a modified version of CALCRIM 2511 applicable to a charge of section 29805—possession of a "firearm" by person prohibited to do so due to a conviction, and the person stipulates to the conviction. CALCRIM 2511 provides the elements that must be proved under section 29805, and also provides in part, "[If you conclude that the defendant possessed a firearm, that possession was not unlawful if the defendant can prove the defense of momentary possession. In order to establish this defense, the defendant must prove that: [¶] 1. (He/She) possessed the firearm only for a momentary or transitory period; 2. (He/She) possessed the firearm in order to (abandon[,]/ [or] dispose of[,]/ [or] destroy) it; [¶] AND [¶] 3. (He/She) did not intend to prevent law enforcement officials from seizing the firearm.]" (CALCRIM 2511) Defendant requested that the proposed partial instruction under CALCRIM 2511 be modified to replace the term "firearm" with the phrase "dirk or dagger."

The trial court denied defendant's requested jury instruction stating, "In essence, those instructions have to do . . . with firearms. And although there is an argument to be made for transitory or momentary temporary possession, that is subsumed within the defense's other request of instruction, which is 3403, which the court will give."

The trial court instructed the jury with a modified version of CALCRIM 3403, the defense of necessity, as follows, "The defendant is not guilty of a possession of a dirk or dagger if he acted because of a legal necessity. [¶] In order to establish this—in order to establish this defense, the defendant must prove that: [¶] Number one, he acted in an emergency to prevent a significant bodily harm or evil to himself; [¶] number two, he had no adequate legal alternative; [¶] number three, the defendant's acts did not create a greater danger than the one avoided; [¶] number four, when the defendant acted, (he) actually believed that the act was necessary to prevent the threatened harm or evil; [¶] number five, a reasonable person would also have believed that the act was necessary under the circumstances; [¶] AND [¶] number six, the defendant did not substantially contribute to the emergency. [¶] The defendant has a burden of proving his defense by preponderance of the evidence. This is a different standard of proof than beyond a reasonable doubt. To meet the burden of proof by a preponderance of the

31

evidence, the defendant must prove that it is more likely than not that each of the six listed items is true."

### 2. Analysis

Neither section 12020, nor CALCRIM No. 2501 that provides the elements that must be proved under section 12020, state that transitory or momentary possession of the dirk or dagger is a defense to an alleged violation of section 12020.

Defendant relies upon *People v. Mijares* (1971) 6 Cal.3d 415. In that case, the defendant was convicted of possessing heroin in violation of section 11500 of the Health and Safety Code. Evidence in that case supported the conclusion that the defendant had removed a kit containing heroin and drug paraphernalia from a friend's pocket and had thrown it into a field, before driving his friend to a fire station to seek medical attention for a suspected drug overdose. (*Id*. at pp. 418-419.) The Supreme Court held that the jury should have been instructed that momentary possession for the purpose of abandoning or disposing of the narcotic was not unlawful possession for the purposes of Health and Safety Code section 11500. (*Id*. at p. 423.) The court reasoned that a contrary construction "could result in manifest injustice to admittedly innocent individuals." (*Id*. at p. 422.)

"[T]he defense of transitory possession . . . applies only to momentary or transitory possession of contraband for the purpose of disposal . . . ." (*People v. Martin* (2001) 25 Cal.4th 1180, 1191-1192.) A trial court has no duty to instruct the jury on a defendant's theory if there is not substantial evidence to support the defense. (*In re Christian S*. (1994) 7 Cal.4th 768, 783; *People v. Stewart* (1976) 16 Cal.3d 133, 140.)

*People v. Mijares*, *supra*, 6 Cal.3d 415 is inapposite. Here, there is not substantial evidence to support a "momentary possession" defense because there is no evidence that defendant possessed the dirk or dagger for the purpose of disposal. Under the People's version of the facts, defendant denied Officer Bojorquez inquiry whether defendant had any weapons or anything illegal in his possession. Even under defendant's version of the events, he did not advise Officer Bojorquez he intended to dispose of the knife, and he

32

did not dispose of the knife. Instead, Officer Bojorquez searched defendant and found the knife. The trial court did not err by not instructing the jury that transitory or momentary possession of the dirk or dagger is not a violation of section 12020.

Even if the trial court did err in failing to instruct the jury on momentary possession, the error was harmless under either *Chapman v. California*, *supra*, 386 U.S. at pp. 22, 24 [harmless beyond a reasonable doubt], or *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonable probability of more favorable result]. As noted above, the jury was instructed with CALCRIM 3403, the defense of necessity. The jury in finding defendant guilty of possession of a dirk or dagger, necessarily rejected defendant's version of the facts that he disarmed Navarro. There is no indication in the record that it would be reasonable to assume the jury may have viewed defendant's testimony more favorably and acquitted him of the crime based on an alternative defense that defendant possessed the dirk or dagger in order to lawfully dispose of it.

## I.  Impeachment Evidence

Defendant contends that the trial court abused its discretion by admitting into evidence defendant's three prior convictions for impeachment purposes. We disagree.

### 1.  Standard of Review

The trial court's ruling to admit evidence over defendant's objection based on Evidence Code section 352 is reviewed under an abuse of discretion standard of review. (*People v. Avila* (2006) 38 Cal.4th 491, 578 ["We review for abuse of discretion a trial court's rulings on relevance and the exclusion of evidence under Evidence Code section 352"].)

### 2.  Background Facts

Prior to trial, the trial court heard argument concerning the admissibility of defendant's prior felony and misdemeanor convictions in the event he elected to testify, and the trial court took the matter under consideration until the following day. The

following day, the trial court stated, "I did have an opportunity to review the nature of the prior convictions and of the proposed impeachment and my ruling is as follows: The court will allow impeachment of the prior conviction for 245(c), A.D.W. on a police officer, from 2009; will allow impeachment on the prior battery on police officer or peace officer, 243.9 from 2009; and the prior conviction for P.C. 69, felony from 2005. [¶] The court finds specifically, number one, that all three of these crimes involve felonies of moral turpitude. With regards to the 245(c), it's *People v. Means*, 177 Cal.App.3d 138. Battery on a peace officer is *People v. Lindsay*, 209 Cal.App.3d 849. The P.C. 69, *People v. Williams*, 72 Cal.App.4th 1460. [¶] . . . [¶] The court's intention is to sanitize each of these prior convictions so that the D.A. may ask whether or not they are felonies involving moral turpitude on three separate occasions. [¶] So no mention of the nature of the conviction should be made. . . . [A]s [defendant's counsel] pointed out, the purpose of the impeachment is, in fact, to delve in whether or not the person is a reliable witness, not as to whether or not there's a propensity to commit violence or character evidence otherwise." Defendant testified that in 2007 and 2008 he was convicted of three felony convictions for crimes of moral turpitude.

### 3.     Analysis

"[A] witness' prior conviction [is] admissible for impeachment if [it] involve[s] moral turpitude. We reemphasize that even such admissibility is subject to trial court discretion under [Evidence Code] section 352." (*People v. Castro* (1985) 38 Cal.3d 301, 317.) As the trial court recognized, and defendant does not dispute, all three of defendant's prior convictions at issue involve felonies of moral turpitude. (*People v. Williams* (1999) 72 Cal.App.4th 1460, 1464; *People v. Lindsay* (1989) 209 Cal.App.3d 849, 857; *People v. Clarida* (1987) 197 Cal.App.3d 547, 552; *People v. Means* (1986) 177 Cal.App.3d 138, 139.)

Defendant contends that the evidence of defendant's three prior felony convictions involving felonies of moral turpitude was inadmissible because "its prejudicial impact far outweighed its probative value." Evidence Code section 352 provides that, "The court in

34

its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The evidence was relevant to the impeachment of defendant. Defendant contends, however, that he was prejudiced by the introduction of the challenged evidence because it served more "to improperly demonstrate that [he] was a violent criminal likely to commit the charged crime than [it did] to properly question his credibility." The trial court, however, "sanitized" the evidence by precluding any mention of the nature of the convictions. The only evidence of defendant's three felony convictions was defendant's testimony that he suffered them in 2007 and 2008, and no detail of the convictions was otherwise provided. The trial court did not abuse its discretion by admitting into evidence defendant's three prior convictions for impeachment purposes.

### J.    Credits

Defendant contends, based upon principles of equal protection of the law, that he is entitled to an additional 39 days of conduct credit (enhanced one-for-one conduct credits) under the amendment to section 4019 applicable to crimes committed on or after October 1, 2011, even though he committed his offense of carrying a concealed dirk or dagger before October 1, 2011. We conclude that equal protection principles do not require retroactive application of the October 1, 2011, amendment to section 4019.

Defendant committed his offense on June 9, 2011. The version of section 4019 in effect at the time defendant committed his offense provided that he accrued conduct credits at the rate of two days for every four days of actual time served in presentence custody. (Stats. 2010, ch. 426, § 2.) Defendant was sentenced to state prison for a term of six years, and was awarded 182 days of custody credit consisting of 122 days of actual custody credit and 60 days of conduct credit.

Operative as of October 1, 2011, section 4019 was amended to provide one-for-one presentence conduct credits for crimes committed on or after October 1, 2011. (Stats

2011, ch. 15, § 482.)  Section 4019, subdivision (h) states in pertinent part:  "The changes to this section enacted by the act that added this subdivision shall apply prospectively and shall apply to prisoners who are confined to county jail . . . for a crime committed on or after October 1, 2011.  Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law."

In *People v. Brown* (2012) 54 Cal.4th 314, our Supreme Court rejected an argument that "apply[ing] former section 4019 prospectively violates the equal protection clauses of the state and federal Constitutions.  (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).)"  (*People v. Brown*, *supra*, 54 Cal.4th at p. 328.)  The court explained:  "The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally.  [Citation.] Accordingly, '"[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner."'  [Citation.]  'This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged."'  [Citation.]"  (*Ibid.*)  The court then explained that a statute authorizing incentives for good behavior has "important correctional purposes," i.e., promoting good behavior, which "are not served by rewarding prisoners who served time before the incentives took effect and thus could not have modified their behavior in response.  That prisoners who served time before and after former section 4019 took effect are not similarly situated necessarily follows." (*Id.* at pp. 328-329, citing with approval *In re Strick* (1983) 148 Cal.App.3d 906, 913 ["incentive purpose has no meaning if an inmate is unaware of it"]; see also *In re Stinnette* (1979) 94 Cal.App.3d 800, 806 ["it is impossible to influence behavior after it has occurred"].)

The defendant in *People v. Brown*, *supra*, 54 Cal.4th 314 relied on *In re Kapperman* (1974) 11 Cal.3d 542 (*Kapperman*), a case holding "that equal protection required the retroactive application of an expressly prospective statute granting credit to felons for time served in local custody before sentencing and commitment to state

prison." (*People v. Brown*, *supra*, 54 Cal.4th at p. 330.) The court rejected the contention that the question of retroactive application of former section 4019 was controlled by *Kapperman*, *supra,* 11 Cal.3d 542, explaining: "Credit for time served is given without regard to behavior, and thus does not entail the paradoxical consequences of applying retroactively a statute intended to create incentives for good behavior. *Kapperman* does not hold or suggest that prisoners serving time before and after the effective date of a statute authorizing conduct credits are similarly situated." (*People v. Brown*, *supra*, 54 Cal.4th at p. 330; see *People v. Lara* (2012) 54 Cal.4th 896, 906, fn. 9 [declining to find equal protection violation with prospective application of October 1, 2011 amendment]; *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1548 [holding that "the amendment to Penal Code section 4019 that became operative October 1, 2011 . . . applies only to eligible prisoners whose crimes were committed on or after that date"].) Accordingly, we conclude that defendant is not entitled to the additional accrual of conduct credits under the October 1, 2011, amendment to section 4019.

Relying on *People v. Olague* (2012) 205 Cal.App.4th 1126, defendant argues that he is statutorily entitled to increased presentence conduct credits for the time in custody after October 1, 2011. The Supreme Court granted review in *Olague*, and that opinion is no longer considered published (Cal. Rules of Court, rule 8.1105(e)(1)) and may not be relied on or cited (Cal. Rules of Court, rule 8.1115(a)). On March 20, 2013, review of *Olague* was dismissed by the Supreme Court under California Rules of Court, rule 8.528(b)(1), in light of the decision in *People v. Brown, supra,* 54 Cal.4th 314, and remanded to the Court of Appeal.

The Attorney General concedes, however, that defendant is entitled to additional custody credits because he was in actual custody for a longer period than for which he received credit. We agree.

Defendant was given 182 days of custody credit calculated based on 122 days of actual custody. Defendant, however, was arrested on June 9, 2011, and as stated by the Attorney General, defendant "apparently was in continuous custody until he was sentenced on November 8, 2011, i.e., *152* days later," not 122 days.

As noted above, the version of section 4019 in effect at the time defendant committed his offense provided that he accrued conduct credits at the rate of two days for every four-day period of actual presentence custody. Defendant's conduct credit is calculated by taking the number of actual custody days, dividing it by four, discarding any remainder, and multiplying the result by two. (*People v. Dieck* (2009) 46 Cal.4th 934, 939; *In re Marquez* (2003) 30 Cal.4th 14, 25-26; *People v. Torres* (2011) 198 Cal.App.4th 1131, 1151-1152.) Applying this formula, defendant was entitled to 76 days of conduct credit (152 days of actual custody, divided by four, multiplying the result by two), for a total of 228 days of custody credit (152 days of actual custody credit plus 76 days of conduct credit). Defendant therefore is entitled to 228 days of custody credit, not 182 days.

### K. CALCRIM 226

Defendant contends that the trial court erred by instructing the jury under CALCRIM 226, as modified, in violation of his due process rights. We disagree.

#### 1. *Background Facts*

The trial court instructed the jury with CALCRIM 226, as modified, as follows: "You alone, must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part, or none of none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe. [¶] In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are: [¶] How well could the witness see, hear, or otherwise perceive the things about which the witness testified? [¶] How well was the witness able to remember and describe what happened? [¶] What was the witness's behavior while testifying? [¶] Did the witness understand the questions and answer them

38

directly? [¶] Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided? [¶] What was the witness's attitude about the case or about testifying? [¶] Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony? [¶] How reasonable is the testimony when you consider all the other evidence in the case? [¶] Has the witness been convicted of a felony? [¶] Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently. [¶] If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

### 2. Analysis

Defendant contends that the following factors included in the jury instruction based on CALCRIM 226 "unfairly favored [the] prosecution:" (1) "Has the witness been convicted of a felony?" and (2) "If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest." The trial court did not err in including the two challenged factors in the jury instruction.

Defendant admitted that he was convicted of three felony convictions for crimes of moral turpitude. Evidence of "conduct involving moral turpitude is admissible to impeach a witness in a criminal case." (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 21, citing *People v. Wheeler* (1992) 4 Cal.4th 284, 295-297; see also Evid. Code, § 788.)

Defendant contends that because the jury could disregard his entire testimony, the jury instruction "lightens the burden of proof to be borne by the prosecution in contravention of the Fourteenth Amendment." The Supreme Court rejected a similar argument in *People v. Beardslee* (1991) 53 Cal.3d 68. In that case, the trial court instructed the jury that, "'A witness willfully false in a material part of his testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point unless from all the evidence you shall believe the probability of truth favors his testimony in other particulars. [para.] However, discrepancies in a witness's testimony or between his testimony and that of others, if there were any, do not necessarily mean that the witness should be discredited. Failure of recollection is a common experience and innocent misrecollection is not uncommon.'" (*Id*. at p. 94.) The Supreme Court rejected the defendant's contention that "[b]ecause the instruction could be applied to the testimony of defendant . . . it erroneously shifted the burden of proof by allowing the jury to reject his entire testimony" thereby increasing his burden of proof. (*Id*. at pp. 94-95.) The Supreme Court explained, "The instruction at no point *requires* the jury to reject any testimony; it simply states circumstances under which it *may* do so. [Citation.]" (*Id*. at p. 95.)

Defendant contends that the trial court erred by deleting two optional factors from the jury instruction based on CALCRIM 226: (1) "[Did other evidence prove or disprove any fact about which the witness testified]" and (2) "[If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject]." The trial court did not err in deleting those two factors from the jury instruction.

Defendant argues that a photograph was introduced into evidence depicting that he had a cut on his hand following the incident with Navarro, and this "other evidence" proves his testimony that he cut his hand when removing the knife from Navarro. However, the excluded optional portion of CALCRIM 226 that instructs the jury that it may consider whether the witness is credible based on other consistent or inconsistent evidence is covered by the other language included in the jury instruction provided to the

40

jury that, "In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony."

Defendant argues that Officer Bojorquez testified that he could not recall how many minutes it took him to arrive at the incident scene, whether Sergeant Maretti was next to him or still walking up to him when Officer Bojorquez asked defendant whether he had any weapons, certain questions asked of him by defendant's counsel in an earlier session of his testimony, or why he had testified at the preliminary hearing that five police cars had responded to the incident scene instead of three police cars. Defendant contends, therefore, that the trial court erred in deleting from the jury instruction based on CALCRIM 226 that the jury is to consider a witness's testimony to be inconsistent with his or her earlier statement on a given subject if the witness testifies that he or she no longer remembers the given subject. Defendant has not established that the trial court committed prejudicial error in omitting this optional portion of the jury instruction based on Officer Bojorquez's testimony that he no longer remembers these events. This testimony was tangential to defendant's guilt or innocence of the charged offense and, in any event, as noted above, the jury was instructed that it could "consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony."

Defendant also contends that the trial court's instruction to the jury based on CALCRIM 318 "compounded" any error by the trial court in instructing the jury based on CALCRIM 226, as modified. The trial court instructed the jury based on CALCRIM 318 as follows: "You've heard evidence that a statement that a witness made before the trial. If you decide that the witness made that statement, you may use that statement two ways: [¶] Number one, to evaluate whether the witness's testimony in court is believable; [¶] AND [¶] number two, as evidence that the evidence in the earlier statement is true."

Defendant argues that this jury instruction is improper because it "gives the jury only a single option in how to use the evidence," precluding the jury from determining that the witness made an earlier false statement. We disagree.

41

The jury instruction provided that the jury "may" use the out-of-court statement. In addition, as noted above, the jury was instructed based on CALCRIM 226, that "In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony." The trial court also instructed the jury based on CALCRIM No. 220, as follows: "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he's entitled to an acquittal and you must find him not guilty." The trial court did not err in instructing the jury based on CALCRIM 318.

**DISPOSITION**

Defendant's abstract of judgment is to be corrected to provide that he is entitled to 228 days of custody credit consisting of 152 days of actual custody credit and 76 days of conduct credit, instead of 182 days of custody credit consisting of 122 days of actual custody credit and 60 days of conduct credit. We otherwise affirm the judgment.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.

We concur:


TURNER, P. J.


ARMSTRONG, J.